UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOUIS THOMAS,

     Applicant,

v.                                   CASE NO. 8:17-cv-2205-T-23AAS

SECRETARY, Department of Corrections,

     Respondent.
_____/

**ORDER**

     Louis Thomas applies for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and challenges the validity of his state conviction for robbery, for which conviction Thomas serves thirty years imprisonment. Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 7) The respondent admits the application's timeliness. (Doc. 7 at 11)

**Facts[1]**

     Thomas entered a retail store, confronted the store clerk (the "victim"), and demanded money. While in the store, Thomas pulled a stocking over his face and pushed the victim to the back of the store. Thomas took money from the cash register and fled. When the police arrived at the scene, the victim provided a physical description of the perpetrator and his clothing, which description was

_____

[1] This factual summary derives form Thomas's brief on direct appeal and the record. (Respondent's Exhibits 6 and 11)

broadcast to other officers in the area.  Within ten minutes of the broadcast Officer

Liem Mach saw a man — later identified as Thomas — matching the suspect's

description and riding a bicycle less than two miles from the crime scene.  Thomas

was riding a bicycle without a proper registration.  When Officer Mach attempted to

initiate a traffic stop, Thomas fled.  Officer Mach chased Thomas and apprehended

him.  When the victim was brought to the location where Thomas was apprehended,

Thomas was removed from a police car in handcuffs.  The victim immediately

identified Thomas as the robber and advised that he had changed his clothes.

Thomas was arrested.  In a subsequent search of Thomas's backpack the police

discovered the clothing the victim had described that Thomas was wearing when he

entered the store, some nylon stockings, and cash.

Thomas was charged with robbery.  A jury convicted Thomas and he serves

thirty years imprisonment as a prison releasee re-offender.

## **Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

governs Thomas's application.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210

(11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a

highly deferential standard for federal court review of a state court adjudication,

states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693  (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if,

and only if, it is so obvious that a clearly established rule applies to a given set of

facts that there could be no 'fairminded disagreement' on the question . . . .")

(citing *Richter*); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable

application of' those holdings must be objectively unreasonable, not merely wrong;

even clear error will not suffice.") (quoting *Woodall*, 572 U.S. at 419).  *Accord Brown

v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not

the correctness *per se*, of the state court decision that we are to decide.").  The phrase

"clearly established Federal law" encompasses only the holdings of the United States

Supreme Court "as of the time of the relevant state-court decision."  *Williams v.

Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "The [AEDPA]

modified a federal habeas court's role in reviewing state prisoner applications in

order to prevent federal habeas 'retrials' and to ensure that state-court convictions

are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. at 694.

A federal court must afford due deference to a state court's decision.  "AEDPA

prevents defendants — and federal courts — from using federal habeas corpus review

as a vehicle to second-guess the reasonable decisions of state courts."  *Renico v. Lett*,

559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of

the doubt' . . . .") (citations omitted).  If the last state court to decide a federal claim

explains its decision in a reasoned opinion, a federal habeas court reviews the

specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.  "[T]he State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Thomas's conviction and sentence.  (Respondent's Exhibit 13)  In another *per curiam* decision without a written opinion the state appellate court affirmed the denial of Thomas's subsequent Rule 3.850 motion for post-conviction relief.  (Respondent's Exhibit 17)  A state appellate court's *per curiam* affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003); *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

- 5 -

contrary."); *Bishop v. Warden*, 726 F. 3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster*, 563 U.S. at 181–82, explains, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

Thomas bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of Thomas's post-conviction claims warrants deference in this case. (Order Denying Motion for Post-Conviction Relief, Respondent's Exhibit 15)

### Ineffective Assistance of Counsel

Thomas claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not  functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Thomas must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. To meet this burden, Thomas must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Thomas cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent

- 8 -

or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

      *Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014), *cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015), explains the required extent of counsel's investigation:

> [W]e have explained that "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1317. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 (emphasis added). "[C]ounsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." *Chandler*, 218 F.3d at 1318. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538.

*See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty to raise a frivolous claim).

      Under 28 U.S.C. § 2254(d) Thomas must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 106.  *Pinholster*, 563 U.S. at 202 (stating that an applicant must overcome this "'doubly deferential' standard of *Strickland* and [the]

AEDPA"), *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."), and *Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim — which is governed by the deferential *Strickland* test — through the lens of AEDPA deference, the resulting standard of review is "doubly deferential."), *cert. denied*, 134 S. Ct. 191 (2013).

Because the state court correctly recognized that *Strickland* governs each claim of ineffective assistance of counsel, Thomas cannot meet the "contrary to" test in Section 2254(d)(1). Thomas instead must show that the state court unreasonably applied *Strickland* or unreasonably determined the facts. In determining "reasonableness," a federal application for the writ of habeas corpus authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not an independent assessment of whether counsel's actions were reasonable. *Putnam v. Head*, 268 F.3d 1223, 1244, n.17 (11th Cir. 2001), *cert. denied*, 537 U.S. 870 (2002). The presumption of correctness and the highly deferential standard of review requires that the analysis of each claim begin with the state court's analysis.

**Ground One**

Thomas contends that the trial court erred by conducting an "inadequate" *Nelson*[2] hearing. Thomas argues that he advised the trial judge that his trial counsel failed to both file a "meritorious" motion to suppress and effectively communicate with him about the case. He alleges that "the circumstances of his case implicate constitutional due process violations" and that his "interactions with counsel constituted 'good cause,' such as a complete breakdown in communication and an irreconcilable conflict over the meritorious motion to suppress," warranting appointment of new counsel. (Doc. 1 at 20)

The respondent correctly argues that, to the extent Thomas argues that the trial court misapplied *Nelson*, he cannot obtain relief because he alleges a violation of state law. Federal habeas relief for a person in custody under the judgment of a state court is available only on the ground that the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Whether the trial court correctly applied either state law or a state procedural rule is a matter of state law that is not cognizable on federal habeas corpus review. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (internal quotations and citations omitted); *Estelle v. McGuire*, 502 U.S.

---

[2] *See Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

62, 67 (1991) ("[I]t is not the province of a federal habeas court to re–examine state-court determinations on state-law questions.").

To the extent that he argues that the trial court's "inadequate" *Nelson* hearing violated his federal constitutional rights to self-representation and due process, Thomas cannot obtain relief.[3]  *Nelson* establishes "the procedure which the trial court should follow for the purpose of protecting an indigent's Sixth Amendment right to counsel in a criminal prosecution where before the commencement of the trial the Defendant moves to discharge appointed counsel."  *Nelson*, 274 So. 2d at 258.[4]  The United States Supreme Court has established no procedure for when an indigent criminal defendant with court-appointed counsel does not want to proceed *pro se*, but instead wants another court-appointed lawyer because his current lawyer is allegedly ineffective.  *United States v. Garey*, 540 F.3d 1253, 1262 (11th Cir. 2008) ("Although the Sixth Amendment guarantees counsel, it does not grant defendants the unqualified right to counsel of their choice.  An indigent criminal defendant 'does not have a right to have a particular lawyer represent him, nor to demand a different appointed lawyer except for good cause.'") (quoting *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985)).  A defendant must show good cause — a fundamental

---

[3] The state appellate court rejected this argument in Thomas's direct appeal. (Respondent's Exhibits 11 and 13)

[4] Under *Nelson* "[i]f incompetency of counsel is assigned by the defendant as the reason, or a reason, [that an indigent defendant wants to discharge his court-appointed counsel], the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant." 274 So. 2d at 258–259.

problem that would lead to an apparently unjust verdict — in order to demand a different appointed lawyer.

*United States v. Jimenez-Antunez*, 820 F.3d 1267, 1271 (11th Cir. 2016), explains:

> Good cause exists where there is "a fundamental problem, 'such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.'" *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008) (*en banc*) (quoting *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973)). The exception for good cause protects the right to effective assistance of counsel; if good cause exists, a defendant no longer has effective representation. *See United States v. Rivera–Corona*, 618 F.3d 976, 979 (9th Cir. 2010).

Thomas's "reasons for seeking substitute appointed counsel included counsel's failure to file a motion to suppress, lack of communication, lack of visiting the Petitioner in jail, calling Petitioner a . . . racial slur, and Petitioner's pending bar complaint against defense counsel."  (Doc. 11 at 3)  In his reply Thomas asserts that "the presiding judge did not determine the frequency or adequacy of [appointed counsel]'s communicating with Mr. Thomas and never determined on the record that the motions to suppress were not meritorious and therefore could not be litigated, that [appointed counsel] had adequately communicated with Mr. Thomas, or that an adequate attorney/client relationship existed for proceeding to trial." (Doc. 11 at 3)

Thomas moved for a *Nelson* hearing seeking to discharge his public defender, Marc Parish.[5]  (Respondent's Exhibit 3)  The state court denied the motion after a hearing.  Thomas again moved for a *Nelson* hearing and moved to dismiss the Office of the Public Defender.  During the *Nelson* hearing Thomas explained the basis for his motions (Respondent's Exhibit 10, February 17, 2012, motion hearing at 6–15):

> THE COURT: All right. On State of Florida v. Louis Thomas. . . . The public defender entered a plea of not guilty and demand for discovery. That first attorney was Mr. Swisher. There was an amended information and a reaffirmation of the plea of not guilty. It looks like discovery commenced. I see in the court file a notice of trial for December the 14th.
>
> There was a motion for a *Nelson* hearing. Complaints were made about Attorney Swisher. There was a *Nelson* hearing scheduled for October the 13th of last year. And then prior to that hearing, a public defender, Bethany Jackson, entered a notice. There was also a motion to reset the trial date because of the change in attorneys. And then apparently Public Defender Parish was assigned to the case and the defendant has filed another motion for a *Nelson* hearing that was filed December 20th.
>
> The last time that we were here I went over the *Nelson* hearing with you, giving you a *Nelson* hearing and you explained what your complaints were with Mr. Parish. And the Court made a finding that you — that Mr. Parish was not doing anything below the standard acceptable in the community, the legal community, in representing you.
>
> The you filed the following:  a motion to suppress evidence. You filed, in fact, a couple of those. And I'm telling you that those motions are nullities because right now Parish is still your attorney.
>
> That's the status of the case as you stand at that podium right now. So, the last time you were here, I heard all your complaints. I said that your complaints did not rise to the

---

[5] Public defender John Swisher was originally appointed to represent Thomas. Thomas moved to discharge Swisher, which motion was denied. The case was subsequently reassigned before trial to public defender Marc Parish.

level where I had to remove Parish. So now, do you want to continue with Attorney Parish?

THE DEFENDANT: No, sir.

THE COURT: Do you want to hire a lawyer?

THE DEFENDANT: I can't afford a lawyer, sir.

THE COURT: Okay. So what do you want to do?

THE DEFENDANT: I do not want Mr. Parish to represent me.

THE COURT: Okay.

THE DEFENDANT: And I've never went through no *Nelson* hearing with Mr. Parish. I never stand before you with a motion, a *Nelson* hearing with my complaint against Mr. Parish, period.

THE COURT: Let's go through, one more time, your complaints with Mr. Parish. Go ahead.

. . . .

THE DEFENDANT: I have a Bar complaint against Mr. Parish that's pending right now, sir.

THE COURT: All right. That's not a ground. Go ahead.

THE DEFENDANT: Mr. Parish supposed to came — I have no communication with Mr. Parish. I think it's rude for (unintelligible) of communication and plus diligency. Mr. Parish have not even came to visit me. Mr. Parish have not done anything for me. Mr. Parish told me he would not file no motions period. Him and Mr. Swisher is conspired against me and I don't trust Mr. — I don't have no confidence in this man.

When I first came to jail I was taking two blood pressure medications. Now I'm taking five because Mr. Parish have not came to visit me. He told me he was going to come and visit me. He told me he would help me out, he'll fight for me. He told me he's not intimidated by you. He told me he'll step before you and then Mr. Parish, when I told him I was going to file a Bar complaint against Mr. Parish and Mr. Parish told — I said like I needed him and Swisher. He told me in the cell that

he don't care what I do, porch monkey. And to me that's a racial slur.

THE COURT: Okay.

THE DEFENDANT: And I have no confidence in this man, period, with my life at stake. I'm a grandfather, first time, and I don't trust Mr. Parish. Mr. Parish has not done nothing for me. He don't even visit me. I have sent 62's to him six times. He never came to visit me. And he promised me he was going to visit. He told me, said he going to visit me. And, like, I say, I had a hearing for a complaint against him at the Bar. I have paper here from the Bar telling him to come [visit] me on the 24th of last month. He did not come. Then I filed a bar [*sic*] and made a formal complaint against Mr. Parish. It's right now, it's already pending.

THE COURT: Okay.

THE DEFENDANT: I have the paperwork here to show.

THE COURT: Okay. I reviewed your motion for *Nelson* hearing. And let's — we'll go through it paragraph by paragraph.

Marc Parish failed to challenge the defendant [*sic*] by raising the constitutionality of identification. Okay? That didn't make any sense at all, that paragraph. But I'm sure that you have some sort of a complaint about your identification in the case. You requested him to submit a motion to suppress and he failed to file a motion to suppress regarding misidentification. That's what paragraph two says.

Mr. Nelson [*sic*], have you reviewed the facts of the case?

MR. PARISH: Yes, sir.

THE COURT: Mr. Parish, do you have — have you reviewed the facts of the case?

MR. PARISH: I have, sir.

THE COURT: In your professional judgment, does a motion for misidentification exist?

MR. Parish: No, sir.

THE COURT: All right. Now, the reason I ask a lawyer that question is because he has four years of college, three years of law school and years of experience as an attorney. Now let's go to you. What is your educational background?

THE DEFENDANT: Tenth grade, sir.

. . . .

THE COURT: Counsel failed to subpoena for a deposition witness. Have you subpoenaed people for deposition or has your office subpoenaed people for deposition?

MR. PARISH: At this point in time the depositions of all the witnesses except for one, which was added, I believe, a month ago. And we tried doing that on Tuesday. That person did not show up so we're in the process of resetting that now.

THE COURT: Okay.

MR. PARISH: That'd be the last witness.

THE COURT: All right. So in paragraph five, counsel failed to subpoena the victim. That's not true?

MR. PARISH: I have the transcript here from that deposition.

THE COURT: Okay. So then you, again, talk about this motion to suppress identification. And he failed to schedule a pro visit after being requested. I'm not really sure what that means. But, have you visited with this man?

MR. PARISH: I visited with him here in court and any issues regarding personal visits at the jail, I believe, [are] being taken up with the Bar. And that was for the purposes of not sort of going into attorney/client privilege.

. . . .

THE COURT: Okay. So you've had Mr. Swisher; you complained about him. You had Ms. Jackson; you didn't complain about her.

THE DEFENDANT: Because see, sir, I had Ms. Jackson, right, and Ms. Jackson helped me out. Okay. Mr. Swisher have done nothing for me in 10 months.

- 17 -

THE COURT: Okay.

THE DEFENDANT: Okay? Ms. Jackson came in and stepped to the plate and she represented me to the fullest for two weeks. When she got my dispatch records reflected that the victim lied on — about how I came into the store, so on and so on. And then she was removed for no reason at all. I wrote Mr. Dillinger asking why when I had a woman that is willing to fight for me when she told me she would. And she said she read my discovery entirely.

What I ask him to talk to her — when I first met this gentle-man October 27th he told me he would fight for me and he told me he got to talk to Swisher first. Ms. Jackson, when she represented me, she told me that she — once she got — she read my discovery entirely. She's willing to represent me to the fullest extent and she said I got investigators watching — observing your dispatch records. She said, you will that [*sic*] and she got it with me in two weeks.

Strangely, on the 27th when I meet this gentleman here, she disappeared for no explanation at all. And then I ask him why was she dismissed. He told me that she did not have the experience. I couldn't believe that, sir.

THE COURT: Okay. Like I say, I don't run the Public Defender's Office and how they assign public defenders. I've pretty much covered everything that you covered in your motion to discharge Mr. Parish. Okay? He's indicated that your request to run a motion to suppress[, h]e ethically cannot run it as an attorney. He has a lot more legal knowledge than you. I don't know who does your research, whether you do it yourself or one of those jailhouse lawyers is doing it for you. But the jailhouse lawyer's not going to do a day of your time. You have to understand that. So at this juncture I cannot remove Mr. Parish.

THE DEFENDANT: I don't want him, sir.

THE COURT: All right.

THE DEFENDANT: I don't trust him.

THE COURT: Well, so, you're going to have to decide what your next move is going to be. Okay? So, I'm not going to — so you can either have you or your family hire someone or embark on self-representation after a proper motion for a

- 18 -

> *Faretta* hearing. But in the meantime, these motions that you
> filed are stricken as nullities.

Thomas subsequently moved for a *Faretta* hearing.  After a hearing and through colloquy, the state court granted the motion and Thomas proceeded *pro se* with Parish as standby counsel.  Thomas filed another motion to suppress and was granted a hearing on the motion.  After encountering difficulty with examining a witness during the hearing, Thomas elected to have Parish re-appointed. (Respondent's Exhibit 7, transcript of November 2, 2012, at 38–39)  Parish again asserted that no basis for suppression existed and moved to dismiss the motion, which motion the state court granted.

Later Thomas again moved to dismiss Parish and moved to proceed *pro se* so that he could litigate the motion to suppress.   The state court held a hearing on the motions during which Thomas again complained that Parish would not communicate with him or file a motion to suppress.  The judge inquired (Respondent's Exhibit 8, transcript of January 17, 2013, hearing at 5–12):

> THE COURT: What's the basis of your motion to dismiss
> counsel today, Mr. Thomas?
>
> THE DEFENDANT: First of all, my motion's based, again,
> on the facts that I had [at] that suppression hearing. And before
> I had the suppression hearing, before I became *pro se*, Judge
> Luce instructed me before he granted a *Faretta* hearing, he told
> me if I filed any frivolous motions, that they would be striked
> [*sic*]. And, apparently, Judge Luke [*sic*] seen that my motion
> had merit to it because he wouldn't address my motions to be
> filed within the court. But my main concern was after the
> hearing of the suppression hearing [*sic*], Mr. Parish and I, he
> came back and talked to me in the back. As he was speaking to
> me and he just told me, he showed me, the things that I did
> wrong as part of the suppression hearing. And then I asked him
> why he wouldn't honor my motions. And his — it was his

exact words to me was that his boss man, which is John Swisher, told him I have no grounds, and he say he can't go against his boss. And then I said, well, okay, since you my full time —

. . . .

THE COURT: If you say, this is what Mr. Parish and I talked about in private, I can't say, oh, Mr. Parish, you can't respond to what Mr. Thomas said to defend yourself because you're going to give up attorney-client [privilege]. If you were going to tell us all this stuff, supposedly he said she said, in your own attorney-client relationship, then Mr. Parish has to be given a fair opportunity to respond. So, I'm cautioning you as to what you're going to tell us as far as this complaint is concerned. Is the bottom line you want to go back to representing yourself and do the motion to suppress?

THE DEFENDANT: No, sir. I would like to dismiss the Public Defender's Office because I have a bar complaint against —

THE COURT: That's not a basis to dismiss a lawyer. You can't — anybody can — if that was the case, you just file a bar complaint, hey, I got a new lawyer. Everybody in here would — we'd have — they'd have six or seven different lawyers. That's not a basis.

THE DEFENDANT: Yes, sir.

THE COURT: If there's a factual basis — what has he not done that you think he needs to, or that you believe needs to be done in your case; the filing of the motion to suppress?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Well, Mr. Parish, do you think there's a basis, a legal basis, to file a motion to suppress?

MR. PARISH: No, sir.

THE COURT: All right. You know, I — this — we had this argument, whether or not we had this discussion with another client already because he was upset and wanted to fire his lawyer because the lawyer wouldn't file a motion to suppress he said that he needed to file. And I explained to that client, as I'm going to explain to you, that there — the lawyer has to have a good-faith belief that there's a basis to go forth

- 20 -

with the motion to file it. It's not, my client wants me to file a motion to suppress, so I'm going to file it. If the lawyer assesses the situation and decides there's not a sufficient legal basis, then as a matter of ethics, the lawyer cannot file the motion, so, is that what you're telling me, Mr. Parish?

MR. PARISH: It is, sir. And, like Mr. Thomas stated, following the culmination of the last motion, I took the time to explain everything he did wrong, the appropriate methods to conduct a motion to suppress and prepare his questions ahead of time, all the different things necessary should he desire to proceed on that course.

THE COURT: Okay.

THE DEFENDANT: Your Honor, excuse me, sir.

THE COURT: So Mr. Parish is not going to be filing the motion to suppress for the reasons indicated. So where does that leave you?

THE DEFENDANT: Okay. And not only that, sir, I've been having problems with Mr. Parish as far as him doing anything for me. I had a bar complaint against Mr. Parish. I also have got a bar complaint against Mr. Swisher pertaining —

THE COURT: He's not even your lawyer.

THE DEFENDANT: I know. But I'm saying based on what — what I was told, I filed a bar complaint based on the conversation we had, me and Mr. Parish had. Mr. Parish have never came and visit me. I've been — he's been my attorney since October the 27th, 2011. He never visit[ed] me. He never asked for any of my 62's. We don't have no type of communication and relationship as far as —

THE COURT: All right. Well, the subjective relationship you have and whether you feel good about it is not a basis. Have you had discussions — responded to his 62's, Mr. Parish?

MR. PARISH: I've discussed these issues previously on the record. I've discussed them with the Florida Bar. They've dismissed his complaint. And I'll stand by anything I've previously said.

THE COURT: All right. Anything additional, Mr. Thomas? I'm not dismissing the PD's office based on what I've heard.

- 21 -

THE DEFENDANT: Well, sir, right as far as I can say, sir, the public defender office and the state attorney is trying to — it conspired against me in this situation.

THE COURT: Oh, now, . . . we got the conspiracy theory out there now, right?

THE DEFENDANT: It is, sir, because —

THE COURT: They're conspiring against you. The fact that you have what, how lengthy a criminal record? And the fact that you're alleged to have committed a serious offense that you're facing a 30-year min[imum] mand[atory]. And they're the only people standing between you and potentially going to prison for the next 30 years or so.

. . . .

THE COURT: All right. Do you want — I guess, bottom line is, do you stay with Mr. Parish? There's not a basis for you, for them to come off. And I'm frankly, you know, this history of this back and forth, it's all my lawyer's fault is something that I've seen over and over again in the system. So, if you want to represent yourself, fine. You've got a trial on April 2nd. You've been through it all with Judge Luce. I'll tell you all the foolish things, which you've already established for yourself in trying to conduct a motion to suppress. So you don't need me to tell you how you're going to be disadvantaged representing yourself because you've already proven it apparently even though I wasn't there on one occasion before. But if that's what you want to do, that's fine.

The judge inquired of Thomas about his educational background and his understanding of legal procedure. The judge advised Thomas that, if he represented himself and renewed the motion to suppress, the motion would be addressed during the course of the trial and not in another suppression hearing. (Respondent's Exhibit 8, transcript of January 17, 2013, hearing at 12–15) The judge advised Thomas of the disadvantages of proceeding *pro se* and inquired of Thomas

- 22 -

who he wanted to represent him at trial (Respondent's Exhibit 8, transcript of

January 17, 2013, hearing at 15–18):

> THE COURT: You're going to be at a disadvantage. He's
> been doing this for 30 years. You've never done this before.
> You've got a tenth grade education and no background. It's a
> ridiculous idea for anybody to ever self-represent but people
> decide to do it all the time. But you understand that you're
> going to be disadvantaged in doing this. You've already
> demonstrated that. I mean, you should be the poster child
> for somebody saying I don't want to represent myself based on
> apparently what happened in the last hearing. Understanding
> all that, you're still making the free and volitional decision that
> you choose to represent yourself?
>
> THE DEFENDANT: You leave me between a rock and a hard
> place on that one, sir. I guess I can't have another suppression
> hearing. Is that what you're saying?
>
> THE COURT: You can object to the admission of the
> evidence. I'm just not going to go . . . chasing my tail for four or
> five hours on something that we've already gone through once.
> Typically, with a lawyer you would set the hearing in advance
> of the trial, but it's not required. There's nothing that says you
> have to. If we're in trial, jeopardy attaches and I grant the
> motion, State's got a problem. But they don't have a problem
> in doing it that way because they've — they're confident that
> they're going to win as far as the motion's concerned. Is that
> right?
>
> [THE PROSECUTOR]: That's right, judge.
>
> THE COURT: All right. And so, there's nothing that says I
> can't do it. If I get it wrong it doesn't really matter if I get it
> wrong and I should have granted it, and I deny it, because it's
> going to be on appeal.
>
> And it doesn't matter whether it's pretrial or a trial because
> eventually if you get convicted and I was mistaken about not
> granting the motion to suppress, the Court's not going to care
> whether I didn't — whether I did it in the trial or whether I did
> it in advance of the trial.
>
> So logistically it makes more sense to do it this way. So, yeah,
> you'll be able to argue at the trial. We'll probably proffer some
> of the witness testimony outside the hearing of the jury and

you'll be able to argue that I shouldn't allow them to testify.
And so, yes, we will have a motion to suppress but it will be
as part of the trial itself. So, no, we're not going to have one
in advance of the trial. Everybody's going to show up and
we're going to do the trial and go from there. So that's how
I'm planning on handling it. So with that in mind and given
everything we've discussed, you've got a choice to make
whether you want to represent yourself or whether you want
to stick with Mr. Parish.

THE DEFENDANT: Well, I have no choice. I guess I have
to represent [*sic*] Mr. Parish then.

THE COURT: You want — you're going to stick with Mr.
Parish?

THE DEFENDANT: Yes, sir. I have to.

THE COURT: All right. Then we'll indicate that he's
withdrawing the motion to dismiss counsel at this point. . . .

Thomas proceeded to trial represented by Parish.

Thomas fails to show "good cause" justifying entitlement to a different

appointed lawyer. *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir.1985),

explains:

> Good cause for substitution of counsel cannot be determined
> "solely according to the subjective standard of what the
> defendant perceives." *McKee v. Harris*, 649 F.2d at 932. A
> defendant's general loss of confidence or trust in his counsel,
> standing alone, is not sufficient. *Id. See also Hutchins v. Garrison*,
> 724 F.2d 1425, 1430–31 (4th Cir. 1983) (rejecting ineffective
> assistance of counsel claim where defendant's trial counsel had
> moved to withdraw due to lack of communication with
> defendant allegedly stemming from defendant's distrust based
> on defense counsel's earlier service as assistant district
> attorney), *cert. denied*, 464 U.S. 1065, 104 S. Ct. 750, 79
> L. Ed. 2d 207 (1984). A defendant, by unreasonable silence or
> intentional lack of cooperation, cannot thwart the law as to
> appointment of counsel.

Neither Thomas's disagreement with Parish about the viability of a motion to suppress nor his unsupported allegations of a breakdown in communication provides a basis for appointment of a different attorney. The state court conducted thorough inquiries into Thomas's allegations and concluded that no basis existed to replace Parish with another appointed attorney. Thomas establishes no violation of either his federal constitutional right to self-representation or his federal right to due process. Accordingly, because he fails to show that the state court either unreasonably applied clearly established federal law or unreasonably determined the facts, Thomas is entitled to no relief on ground one. 28 U.S.C. § 2254(d)(1), (d)(2).

**Ground Two**

Thomas contends that the state post-conviction court's denial of grounds one and two of his Rule 3.850 motion resulted in either an unreasonable application of clearly established federal law or an unreasonable determination of the facts. In ground one of his Rule 3.850 motion Thomas alleges that his trial counsel rendered ineffective assistance by not "mov[ing] for discharge based upon legally insufficient probable cause to stop Petitioner." (Doc. 1 at 25) In ground two of his Rule 3.850 motion Thomas alleges that his trial counsel rendered ineffective assistance by not "mov[ing] to suppress the items seized in the search following his unlawful stop." (Doc. 1 at 25)

Ground One of Rule 3.850 motion

Thomas claims that Officer Liem Mach lacked probable cause to stop him. Thomas asserts that "[t]he BOLO description described the robber as a black male,

possibly wearing a mask, wearing a green jacket, with a big face and *possibly* riding

a bicycle." (Doc. 1 at 28) (emphasis in original)  He argues that his clothing did

not match the description "to a sufficient degree to justify a stop." (Doc. 1 at 28)

Thomas contends that his trial counsel "provided ineffective assistance by failing to

move for discharge based upon legally insufficient probable cause to stop Petitioner."

(Doc. 1 at 25)

The state post-conviction court denied this ground as follows (Respondent's

Exhibit 15, Order Denying Defendant's Motion for Postconviction Relief at 2–3)

(court's record citations omitted):

> In ground one, Defendant's previous motion claimed that
> counsel was ineffective for failing to investigate a police stop
> and move to suppress the stop. The Court previously struck
> that claim as facially insufficient. In Defendant's amended
> motion, he does not address the insufficiencies identified by
> the Court's prior order, but sets out a somewhat different claim.
> Defendant's amended ground one alleges that counsel was
> ineffective for failing to move to dismiss based on allegedly
> manufactured probable cause. He alleges that the police
> manufactured the description of the robber relied upon to stop
> Defendant and alleges that the traffic law relied upon to stop
> Defendant did not exist. Notes in the margins of Defendant's
> exhibits (which are unsworn) appear to suggest that he asserts
> that the bicycle registration ordinance did not apply to him
> because he was a resident of Hillsborough County. Defendant
> alleges that he would have been acquitted if counsel had moved
> to dismiss.
>
> Ground one is without merit because it does not set out
> any ground for dismissing the charges against Defendant[.]
> Defendant filed a *pro se* motion to suppress based on this stop
> while representing himself, and the traffic stop was proper.
> "[C]ounsel cannot be deemed ineffective for failing to object to
> meritless issues." *Thompson v. State*, 759 So. 2d 650, 665 (Fla.
> 2000). The remedy for a violation of the Fourth Amendment
> to the United States Constitution is suppression of evidence
> obtained as a result of the illegal stop, not dismissal of the case.
> *See, e.g., Williams v. State*, 138 So. 2d 960, 961 (Fla. 2d DCA

1999) ("Therefore, the stop was illegal, and all evidence seized as a result of it should have been excluded."). Even if Defendant was correct that the stop was illegal, the issue could be adequately addressed by a motion to suppress and would not give rise to a motion to dismiss. Although Defendant previously alleged that counsel should have filed a motion to suppress, his claim was facially insufficient because he did not specify what evidence would have been suppressed, specify how it would have affected the outcome of the trial, or allege that he would not have been found guilty if counsel had filed a motion to suppress. *See Kormondy v. State*, 983 So. 2d 418, 430 (Fla. 2007); *accord Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Zakrzewski v. State*, 866 So. 2d 688, 694 (Fla. 2003). Defendant's motion still fails to clarify these insufficiencies.

Regardless, counsel was not deficient: the stop was justified because the officer had probable cause to believe that Defendant was in violation of the ordinance requiring residents to register their bicycles. This ordinance requires St. Petersburg residents to register their bicycles and display a license. St. Petersburg, Fla., Code of Ordinances §§ 26-202, 26-204 (2010). Residency is presumed if the person cannot establish non-residence. *Id.* at § 26-202(c). An officer may conduct a traffic stop when he or she has probable cause to believe a traffic violation has occurred. *Gordon v. State*, 901 So. 2d 399, 402 (Fla. 2d DCA 2005); *see State v. Johns*, 920 So. 2d 1156, 1157–[5]8 (Fla. 2d DCA 2006) (holding that an expired license tag justifies a traffic stop). "Probable cause is evaluated from the viewpoint of a prudent cautious police officer on the scene at the time of arrest." *State v. Riehl*, 504 So. 2d 798, 800 (Fla. 2d DCA 1987). The issue is not whether the traffic violation actually occurred, but whether the officer had probable cause to believe that a violation occurred. *State v. Wimberly*, 988 So. 2d 116, 119–20 (Fla. 5th DCA 2008) (holding that a stop based on illegally tinted windows was not invalid merely because the window tint was legal). The officer who made the stop testified at a hearing on Defendant's *pro se* motion to suppress that he observed Defendant riding a bicycle without a registration in St. Petersburg. Even if Defendant was not actually a St. Petersburg resident, the officer had probable cause to stop Defendant based on the lack of registration and his presence in St. Petersburg. There was therefore no basis for a motion to suppress, and counsel was not deficient. Ground one is denied.

Contrary to Thomas's contention, the record supports a finding of probable cause to stop Thomas.  Officer Mach observed Thomas riding a bicycle that lacked

the registration required under local ordinance.  An officer's decision to initiate a traffic stop is generally reasonable "where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  Based on his observation of Thomas, Officer Mach had sufficient probable cause to stop and detain Thomas for failing to comply with the local ordinance requiring a resident to both register a bicycle and display the registration.  *See, e.g., United States v. Barker*, 2013 WL 6231282 at *3 (M.D. Fla. 2013) ("Thus, even if the Court accepted Defendant's testimony that he was not riding his bicycle in the middle of the road as credible, which the Court does not, the officers still had probable cause to stop and detain Defendant given that it was after sunset, and Defendant's bicycle was not properly equipped with a light in violation of Florida Statute § 316.2065(7).  Thus, the officer's stop and subsequent detention of Defendant to investigate the bicycle infractions did not violate Defendant's Fourth Amendment rights).

Thomas establishes neither deficient performance nor resulting prejudice from counsel's alleged error.  *Strickland*, 466 U.S. at 691–92.  Thomas fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground.  28 U.S.C. § 2254(d)(1), (d)(2).

Ground Two of Rule 3.850 motion

Thomas alleges that his trial counsel rendered ineffective assistance by not "mov[ing] to suppress the items seized in the search following his unlawful

- 28 -

stop." (Doc. 1 at 25)  The state post-conviction court denied this ground as follows (Respondent's Exhibit 15, Order Denying Defendant's Motion for Postconviction Relief at 3–4) (court's record citations omitted):

> In ground two, Defendant alleges that counsel failed to move to suppress a search incident to arrest. He alleges that the victim testified in deposition that she saw the clothes from Defendant's backpack before she identified Defendant. He argues that the police must therefore have searched his backpack and removed the clothes before she identified him as the perpetrator. He alleges that any search was unreasonable prior to the victim's identification. He alleges that he would have been acquitted if counsel had brought these facts to the Court's attention.
>
> Ground two is without merit because it continues to be facially insufficient, it is refuted by the record, and Defendant was not prejudiced. First, ground two continues to be facially insufficient because it does not allege that the motion would have been granted. In order to establish prejudice as the result of a failure to file a motion to suppress, a defendant must also demonstrate that the motion would have been successful and the evidence would have been excluded. *See Kormondy v. State*, 983 So. 2d 418, 430 (Fla. 2007); *accord Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Zakrzewski v. State*, 866 So. 2d 688, 694 (Fla. 2003). Even after an opportunity to amend, Defendant has not specifically alleged that the motion would have been granted and the evidence would have been excluded. It therefore continues to be facially insufficient.
>
> Regardless, counsel was not deficient because Defendant's allegations are refuted by the record. While Defendant alleges that the victim testified that she saw the clothes before she identified Defendant, he has taken her testimony out of context. In context, it is clear that the victim's testimony Defendant cites was a misunderstanding. The victim initially testified as Defendant alleges.[6] Counsel continued to ask her questions to clarify her testimony:

---

6 The victim testified in her deposition (Respondent's Exhibit 15, attach. C to final order denying Rule 3.850 motion at 10–11):

> Q: Okay, now let me ask you this. Did you see the clothes from the backpack, or from wherever they had them, did you see that before you were asked to identify him?

(continued…)

Q. Okay. But what I'm trying to find out is did you see the clothes before you saw the person standing next to the police car, or did you see the guy standing next to the police car first?

A. I saw the guy first.

Q. Okay, and then they showed you the clothes.

A. Yes.

_____

A: Yes.

Q: So you knew about the clothes before you saw the person?

A: Yeah.

Q: Did they tell you that the clothes that you were shown came out of that guy's backpack?

A: No. I said when he told me, the sheriff, the police look in the bag, they cannot see, you know, they pull the stuff and the mask and the stuff, you know, I told him that's the stuff he was wearing. And that's the nylon socks and they found that in his bag, the nylon socks, the one he was wearing.

Q: Okay. But did you identify those clothes before or after you saw the person?

A: Oh no, before I told him what he was wearing. I told him he was wearing [a] jacket.

Q: All right.

A: Dark color.

Q: Right?

A: And the pant[s], like khaki color dark. But I'm not sure, you know, because — but I'm sure that's him.

Q: Okay. But what I'm trying to find out is did you see the clothes before you saw the person standing next to the police car or did you see the guy standing next to the police car first?

A: I saw the guy first.

Q: Okay, and then they showed you the clothes[?]

A: Yes.

- 30 -

> It appears, based on the transcript, that the victim was
> confused as to counsel's question initially, but she ultimately
> testified that she saw Defendant first, then saw the clothes. This
> is consistent with Officer Scott Cameron's trial testimony that
> he conducted a search of the backpack after the victim told him
> that Defendant was wearing different clothes. There is therefore
> no basis for Defendant's allegation that the search occurred
> prior to the identification. Ground two is denied.

To obtain relief on an ineffective assistance of counsel claim for failing to file a motion to suppress, Thomas must prove that (1) counsel's representation fell below an objective standard of reasonableness, (2) he has a meritorious Fourth Amendment claim, and (3) a reasonable probability of a different verdict exists absent the excludable evidence. *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

Thomas fails to show that he has a meritorious Fourth Amendment claim. Thomas presents no evidence showing that his arrest was unlawful. Accordingly, a motion to suppress the contents of the backpack obtained as a result of a search incident to his lawful arrest would have failed. Thomas also presents no evidence to substantiate his allegation that the police impermissibly showed the victim the contents of the backpack before she identified Thomas as the perpetrator. Because Thomas fails to establish a meritorious Fourth Amendment claim, he cannot sustain his ground of ineffective assistance of counsel for not filing a motion to suppress this evidence. *Zakrzewski*, 455 F.3d at 1260. Thomas fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground. 28 U.S.C. § 2254(d)(1), (d)(2).

- 31 -

**Ground Three**

Thomas contends that his trial counsel rendered ineffective assistance by not moving to suppress the victim's show-up identification of Thomas.  Thomas argues that when the victim identified him, he was surrounded by police officers and was the only black male at the scene.  He further argues that he did not match the description of the suspect and that the police showed the victim the contents of his backpack — including clothing worn during the robbery — before the victim identified him.  Thomas alleges that his trial counsel should have moved to suppress the victim's identification based on this allegedly suggestive identification procedure.

The state post-conviction court denied this ground as follows (Respondent's Exhibit 15, Order Denying Defendant's Motion for Postconviction Relief at 4–6) (court's record citations omitted):

> In ground three Defendant alleges that counsel should have moved to suppress the show-up identification. He alleges that the victim was asked to identify him while he was handcuffed, after she had been shown the clothes, and where there were no other black males. Defendant alleges that he would have been acquitted if counsel had brought these facts to the Court's attention.
>
> Ground three is without merit because it continues to be facially insufficient and the motion would have been denied if counsel had made it. First, this ground continues to be facially insufficient because Defendant does not specifically allege that the motion would have been granted and the evidence excluded. *See Kimmelman*, 477 U.S. at 375; *Kormondy*, 983 So. 2d at 430; *Zakrzewski*, 866 So. 2d at 694. Second, this motion would have been denied. "[S]how-ups are not invalid unless the police aggravate the suggestiveness of the confrontation or the procedure gives rise to a substantial likelihood of irreparable misidentification under the totality of the circumstances." *Jenkins v. State*, 96 So. 3d 1110, 1112 (Fla. 1st DCA 2012). Keeping a suspect in handcuffs does not

itself invalidate a show-up. *Id*. The Court should consider the totality of the circumstances, including the length of time between the crime and the confrontation and the witness's opportunity to view the criminal at the time of the crime, degree of attention, accuracy of prior description, and level of certainty. *Perez v. State*, 648 So. 2d 715, 719 (Fla. 1995).

The police did not aggravate the suggestiveness of the identification and there was not a substantial likelihood of irreparable misidentification in this case. The victim identified Defendant the same day as the crime, about half an hour after the crime occurred. She testified that she got a good view of Defendant's face when he was close to her, in the daylight, before he put a stocking over his head. Her prior description of Defendant to the police, although not incredibly detailed, was accurate — as demonstrated by the picture attached to Defendant's motion, he was a muscular, older, bald African-American male. When asked to identify Defendant, she recognized him even though he was wearing different clothing and noted that his clothing was different. The clothing that she testified Defendant was wearing during the robbery was found in his backpack. She testified that she was sure of her identification. Like in *Jenkins*, the fact that Defendant was in handcuffs, by itself, does not invalidate the identification. The fact that he was the only black male is inherent in a one-on-one show-up, and, as addressed in ground two, the victim was not shown the clothes before she identified Defendant. The police did not do anything else to aggravate the suggestiveness. Accordingly, the totality of the circumstances does not give rise to a substantial likelihood of irreparable misrepresentation and the police did not aggravate the suggestiveness of the procedure. A motion to suppress the identification would therefore be denied, and counsel was not deficient for failing to make that meritless motion. Ground three is denied.

A defendant possesses a due process right to exclude identification testimony resulting from an unnecessarily suggestive identification procedure conducive to irreparable mistaken identification. *Manson v. Brathwaite*, 432 U.S. 98, 104 (1977). A suggestive identification procedure, without more, results in no due process violation. *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972). An assessment of the constitutionality of a trial court's decision to admit an out-of-court identification is a

two-step analysis.  First, the court must determine whether the original identification procedure was unduly suggestive.  *Dobbs v. Kemp*, 790 F.2d 1499, 1506 (11th Cir. 1986), *modified in part on other grounds*, 809 F.2d 750 (11th Cir.), *cert. denied*, 481 U.S. 1059 (1987).  If not, the inquiry is over.  *See Perry v. New Hampshire*, 565 U.S. 228, 233 (2012) ("Our decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, show up, or photograph array.  When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.").  Only if the original identification procedure was unduly suggestive must the court consider whether, under the totality of the circumstances, the identification was nonetheless reliable.  *See Perry*, 565 U.S. at 241 ("The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct.").

Thomas fails to show that the identification was unduly suggestive.  *See, e.g., United States v. Walker*, 201 F. App'x 737, 741 (11th Cir. 2006) (*per curiam*) (holding that a one-on-one identification of an individual in front of a marked patrol car with his hands cuffed behind his back was not unnecessarily suggestive).[7]  Even assuming

---

[7] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

that the show-up identification procedure was unduly suggestive, based on the totality of the circumstances, the victim's identification was reliable.  *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).  The victim testified that she had the opportunity to view Thomas when he entered the store and came face-to-face with her.  The victim saw Thomas in broad daylight and had the opportunity to see his face before he put the stocking over his head.  The victim provided the police with a physical description of the perpetrator and his clothing before she was taken to the show-up and unequivocally identified Thomas at the arrest scene less than an hour after the crimes despite Thomas changing his clothes.

Even if the show-up identification was suggestive, the identification was reliable.  *Biggers*, 409 U.S. at 199–200;  *Johnson*, 817 F.2d at 729 (holding that because the *Neil* factors were met, the eyewitness's "out-of-court identification was not unreliable even if it had been impermissibly suggestive, and [the] trial was not rendered fundamentally unfair by the trial court's admission of [the eyewitnesses'] testimony").  Because no constitutional defect exists in the victim's out-of-court identification, trial counsel had no basis to move to suppress the identification. Thomas fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground. 28 U.S.C. § 2254(d)(1), (d)(2).

Accordingly, Thomas's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Thomas and close this case.

## DENIAL OF BOTH
## A CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL IN FORMA PAUPERIS

Thomas is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Thomas must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Thomas is entitled to neither a COA nor leave to appeal in forma pauperis.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Thomas must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on September 30, 2020.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 36 -